UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____20-mj-3346-McAliley_____

UNITED STATES OF AMERICA

v.

REYNALDO CRESPO MARQUEZ,
    a/k/a "El Nino,"

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? _____ Yes __X__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____
Quinshawna S. Landon
Assistant United States Attorney
Fla. Bar No. 99835
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9632
Fax: (305) 530-7976
Quinshawna.Landon@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| Reynaldo Crespo Marquez, a/k/a "El Nino," | ) Case No. 20-mj-3346-McAliley |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of January 4, 2019 - January 20, 2019 in the county of Miami-Dade in the Southern District of Florida, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(iv); 1324(a)(1)(B)(i); and 1324(a)(1)(A)(V)(I) | Conspiracy to encourage and induce aliens to enter the United States for financial gain and encouraging and inducing aliens to enter the United States for financial gain |
| 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii) | Conspiracy to bring an alien into the United States and bringing an alien into the United States for financial gain |
| 18 U.S.C. § 1201(a)(1) and 1201(c) | Conspiracy to commit kidnapping and kidnapping |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

SA Aaron D. Spielvogel, FBI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Face Time (specify reliable electronic means)

Date: August 10, 2020

_____
Judge's signature

City and state: Miami, Florida   Hon. Chris M. McAliley, United States Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Aaron D. Spielvogel, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") Task Force, in the FBI Miami Division, where I am responsible for conducting investigations of transnational organized crime, regarding violations of federal laws, particularly those laws found in Titles 8, 18, 19 and 21 of the United States Code. My duties include investigating violent crimes that involve human smuggling, kidnapping, and extortion, among other crimes. I am, therefore, an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, which empowers me to conduct investigations of, and make arrests for, violations of Title 18 of the United States Code.

2. This Affidavit is submitted for the limited purpose of establishing probable cause that Reynaldo Crespo-Marquez, a/k/a "El Nino" ("CRESPO-MARQUEZ") did knowingly and intentionally:

   a. Conspire to encourage and induce aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv) and 1324(a)(1)(B)(i), all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I);

   b. Encourage and induce aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv);

  c. Conspire to bring aliens into the United States for financial gain, in violation of Title 18, United States Code, Section 371;

  d. Bring aliens into the United States for financial gain, in violation of Title 18, United States Code, Section 1324(a)(2)(B)(ii);

  e. Conspire to commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c); and

  f. Commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(a)(1).

3. The statements contained in this Affidavit are based on my personal knowledge, as well as information provided to me by other law enforcement officers, including those based in Mexico, law enforcement support personnel, and civilian witnesses. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not include every fact known to me in connection with this investigation. I have only set forth the facts that I believe are necessary to establish probable cause for the offenses described in this Affidavit.

## **PROBABLE CAUSE**

4. In or around January 2019, a group of Cuban males (hereinafter called the "VICTIMS") boarded a go-fast style boat in Bahía Honda, Cuba, believing that they were going to be smuggled into the United States.

5. On or about January 6, 2019, the VICTIMS arrived in the vicinity of Progreso, Mexico. CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 met the VICTIMS when they reached the shore and transported them to a house located at or near Merida, Mexico.

6. Once the VICTIMS arrived at the house, CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 directed the VICTIMS to remove their clothing and locked them in a room. The next day, CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 returned to the house. An individual named "El Nino,"[1] also arrived. CO-CONSPIRATOR 1 commanded the VICTIMS to provide contact information for a family member who could pay a fee of $10,000 United States Dollars ("USD") for their release. The kidnappers threatened to beat, disfigure and/or starve the VICTIMS if they did not receive the money.

7. The kidnappers began to call and demand money from the VICTIM's relatives, who resided, among other places, in Cuba, Miami, and Las Vegas, in exchange for the VICTIM's release. Some of the relatives advised the kidnappers that they did not have any money, while others begged for more time to gather the funds. To coerce some of the relatives into paying the fee, the kidnappers sent video recordings of the VICTIMS being shocked with a stun gun and/or beaten. The kidnappers also threatened to kill the VICTIMS if they did not receive the $10,000 USD.

---

[1] The FBI interviewed several of the VICTIMS independently. During the interviews, some of the victims described being kidnapped by a man named "El Nino" and others referred to a "Nino." The victims, however, all picked the same man out of photo line-ups. Thus, the FBI believes that "El Nino" and "Nino" is the same person. For ease of reference and consistency, I will refer to the individual as "El Nino" throughout this Affidavit.

3

8. One of the VICTIM'S relatives contacted their local authority to get assistance in negotiating the VICTIM'S release. The case was referred to the FBI in Las Vegas ("FBI LV"), who opened an investigation.

9. Meanwhile, between approximately January 7, 2019, and January 16, 2019, the kidnappers harassed and threatened the relatives in an effort to collect the money. If a relative was able to pay the $10,000 USD ransom, the kidnappers released the respective VICTIM and sent him by bus to the Mexican-United States border with instructions to seek asylum. For those VICTIMS whose relatives could not pay the fee, they were tortured and moved to different houses while the co-conspirators continued to attempt to collect the money.

10. On or about January 16, 2019, one of the VICTIMS escaped and placed a telephone call to the Mexican authorities, informing them of the location where the VICTIMS were being held captive. The Mexican authorities rescued the remaining VICTIMS.

11. After the VICTIMS were rescued, the FBI in Miami ("FBI Miami") began an investigation, including interviewing several of the VICTIMS and witnesses and determined that after the kidnappers detained the VICTIMS in Mexico and demanded a ransom payment the following occurred:

### VICTIM 1

12. When the kidnappers asked VICTIM 1 for the contact information of a relative who would pay the ransom fee, he provided his uncle's, WITNESS 1, telephone number. The kidnappers called WITNESS 1, who was located in Miami, Florida, and advised him that they were holding VICTIM 1 captive and demanded $10,000 USD for VICTIM 1's release. WITNESS 1 begged the kidnappers not to hurt his nephew and promised to pay the money.

4

13. WITNESS 1, in turn, called another relative, WITNESS 2, to advise him of the kidnapping and to ask for help in gathering the money. WITNESS 2 asked WITNESS 1 to provide the kidnapper with his phone number so that he could coordinate the payment. Shortly thereafter, WITNESS 2, who was located in Miami, Florida, received a telephone call via WhatsApp from Mexico. The kidnapper told WITNESS 2 that VICTIM 1 would be beaten and starved if he did not pay the ransom fee.

14. Over the course of several days, the kidnapper called WITNESS 2 multiple times to obtain the payment. On or about January 9, 2019, the kidnappers sent WITNESS 2 pictures of two passports and directed WITNESS 2 to send money via Western Union to the individuals listed in the passports. WITNESS 2 complied and made several partial payments to the kidnappers via Western Union. At one point, the kidnappers told WITNESS 2 to make a payment to a co-conspirator, who was based in Miami. The Miami-based co-conspirator contacted WITNESS 2, using a U.S. number ending in -2834, and arranged to meet him in Miami to collect the money. Once WITNESS 2 made the final payment of approximately $7,000 in cash, the kidnappers advised WITNESS 2 that VICTIM 1 would be released.

15. Meanwhile, while VICTIM 1 waited for his family members to pay the ransom money, he observed CRESPO-MARQUEZ direct CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 to beat the other VICTIMS and place extortion calls to several of the VICTIMS's relatives. On one occasion, VICTIM 1 witnessed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 tie up another VICTIM, whom he did not know and who had a medical condition, and shock him with a stun gun. The kidnappers, however, did not torture VICTIM 1.

16. VICTIM 1 also heard CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 direct a woman to pick up the payments that the VICTIM's relatives sent via Western Union.

17. On or about January 17, 2019, the kidnappers (along with other unidentified co-conspirators) arranged and paid for VICTIM 1 and another VICTIM to travel by bus to the Mexican-United States border. An unidentified female co-conspirator met them at the bus station, pointed out the bridge to the border that was just a few feet away, and directed them to ask for political asylum.

18. VICTIM 1 did not, and knew that he did not, have prior official authorization to come to, enter, or reside in the United States.

19. As part of its investigation, FBI Miami interviewed VICTIM 1 on January 8, 2020. During the interview, VICTIM 1 reviewed a photo line-up depicting six individuals and identified CRESPO-MARQUEZ as the kidnapper VICTIM 1 knew as "El Nino." VICTIM 1 stated that CRESPO-MARQUEZ appeared to be in charge because he instructed the other kidnappers on what to do.

20. FBI Miami also conducted a logical extraction of WITNESS 2's cellphone. In it, FBI Miami found several WhatsApp communications between WITNESS 2 and a Mexican-based telephone number ending in -0288 that took place during the period of time that VICTIM 1 had been kidnapped. The communications included text messages and audio recorded messages (in Spanish) directing WITNESS 2 to send the ransom payments to co-conspirators via Western Union. In addition, FBI Miami discovered the passport photos that the kidnappers sent to WITNESS 2 and a screenshot of the WhatsApp profile of the Miami-based co-conspirator that

included her picture.[2] Toll records also showed that WITNESS 1 received calls from a Mexican-based telephone number ending in -0288.

21. FBI Miami researched whether the Miami-based co-conspirator made any Western Union payments using the number she used to contact WITNESS 2 ("U.S. Number Ending in -2834"). The research revealed that number was associated with several Western Union payments that she made using her real name, between March 2016 and April 2019. Some of the payments were made to CRESPO-MARQUEZ, in his real name, to Mexican-based telephone numbers that have not been connected to the ransom calls.

22. FBI Miami searched social media platforms and found a Facebook account for the Miami-based co-conspirator. The profile picture that was posted to the Facebook account substantially matches the screenshot of the Miami-based co-conspirator that was recovered from WITNESS 2's cell phone. The Miami-based co-conspirator also posted a background picture of a man and three children. I have reviewed the picture of the man in that background photograph and it substantially matches the six-pack photo that the victims identified as CRESPO-MARQUEZ.

23. FBI Miami subpoenaed the tolls records of the U.S. Number Ending in -2834. The subscriber information listed an individual who uses the same last name as the Miami-based co-conspirator, presumably a relative. FBI determined that the telephone number received and made calls to several Mexican-based numbers. FBI Miami noticed that some of those numbers

---

[2] Witness 2 confirmed that the WhatsApp profile picture looked like the woman who picked up the ransom money from him.

matched the telephone numbers that the Miami-based co-conspirator listed in her Western Union transactions as belonging to CRESPO-MARQUEZ.

24.     FBI Miami also checked the Mexican-based numbers found in the toll records against cell phones seized by Mexican Federal Law Enforcement during the raid of the houses in which the VICTIMS were held captive. In one of the cell phones, one of the Mexican-based numbers was listed in the contacts as "El Nino." Further analysis of the toll records showed that the number associated with the name "El Nino" contacted the U.S. Number Ending in -2834 on January 12, 2019, at approximately 7:08 p.m. Three minutes later, at approximately 7:11 p.m., a call was made from the U.S. Number Ending in -2834 to WITNESS 2's number. Presumably, the Miami-based co-conspirator used the U.S. Number Ending in -2834, although it is subscribed to what appears to be a relative.

25.     Additionally, FBI Miami served a subpoena on Western Union, which revealed that during the period of time that VICTIM 1 was held captive, WITNESS 1 and WITNESS 2 made a total of $3,050 in ransom payments through Western Union.

VICTIM 2

26.     CRESPO-MARQUEZ told VICTIM 2 to contact a family member and figure out who was going to pay the ransom fee. VICTIM 2 called WITNESS 3, his father, who lives in Miami. The kidnappers informed WITNESS 3 that they were holding VICTIM 2 and would kill him if he did not pay $7,000 USD.

27.     WITNESS 3 put his girlfriend on the phone to help negotiate his son's release. According to WITNESS 3, his girlfriend had a contact in Cuba who had helped arrange VICTIM 2's trip to the United States. WITNESS 3 paid an initial payment of $100 but did not pay the remainder of the fee.

28. The kidnappers held VICTIM 2 for approximately ten days. During that time VICTIM 2 witnessed, and personally endured, physical abuse and torture. VICTIM 2 observed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 beat the other VICTIMS with paddles, shock them with stun guns, and threaten to mutilate their bodies. The kidnappers also showed the VICTIMS videos of themselves torturing other victims whom had previously been kidnapped and whom could not pay the ransom fee. VICTIM 2 recalled that in one of the videos, the kidnappers severed a victim's finger with a shovel.

29. During his time in captivity, VICTIM 2 was shocked with a stun gun and remembered CO-CONSPIRATOR 1 telling the group that he had raped the wives of previous kidnapping victims as a form of payment. One of the kidnappers also stated that the VICTIMS's lives were only worth fifteen Mexican pesos—the price of a bullet.

30. On approximately the tenth day of VICTIM 2's captivity, he was taken to another location. The kidnappers (along with other unidentified co-conspirators) arranged and paid for VICTIM 2 and another VICTIM to travel by bus to the Mexican-United States border. An unidentified female co-conspirator met them at the bus station, pointed out the bridge to the border that was just a few feet away, and directed them to ask for political asylum.

31. VICTIM 2 did not, and knew that he did not, have prior official authorization to come to, enter, or reside in the United States.

32. As part of its investigation, FBI Miami interviewed VICTIM 2 on February 13, 2020. During the interview, VICTIM 2 reviewed a photo array depicting six individuals and identified CRESPO-MARQUEZ as the kidnapper VICTIM 2 knew as "El Nino."

33. Additionally, FBI Miami served a subpoena on Western Union, which confirmed that during the period of time that VICTIM 2 was held captive, WITNESS 3 made a $100

9

ransom payment to the kidnappers through Western Union. Toll records also confirmed that WITNESS 3 received phone calls from a Mexican-based telephone number ending in -8266.

### VICTIM 3

34.  VICTIM 3 called his aunt and uncle, WITNESS 4 and WITNESS 5, respectively, who lived in Las Vegas. WITNESS 4 and WITNESS 5, however, did not answer the phone. When the kidnappers finally reached WITNESS 4 and WITNESS 5, they handed the phone to VICTIM 3 and told him to tell his family that he would be tortured and killed if the kidnappers did not receive $10,000 USD. The kidnappers then shocked VICTIM 3, who had medical issues and wore a colostomy bag.

35.  WITNESS 4 and WITNESS 5 contacted the police, who referred the matter to the FBI. Over the next ten days, FBI LV assisted in negotiating VICTIM 3's release. On or about January 9, 2019, FBI LV recorded the calls between the kidnappers and WITNESS 4. The kidnappers called from Mexican-based numbers ending in -0288 and -8286. In the recorded calls, the kidnappers told WITNESS 4 that they would torture VICTIM 3 and deprive him of food until she paid the ransom fee. On or about January 11, 2019, the FBI directed WITNESS 4 to make a $100 payment to the kidnappers via Western Union.

36.  During the negotiation process, the kidnappers moved VICTIM 3 and some of the other VICTIMS between three different houses. The VICTIMS, including VICTIM 3, were starved, routinely beaten and shocked with stun guns, and threatened with death.

37.  The kidnappers also recorded the beatings for the purpose of extorting the VICTIMS's family members for money. For example, the kidnappers sent WITNESS 4 a series of three video recordings, in which they tortured VICTIM 3 while he was naked. In one of the recordings, the kidnappers shocked VICTIM 3 with a stun gun while his hands, feet, and mouth

were bound. The kidnappers also commanded VICTIM 3 to explain that VICTIMS who did not pay the ransom were physically beaten, starved, and not given water. They also told VICTIM 3 to relay that they had not given him food or water for several days.

38. On or about January 16, 2019, one of the VICTIMS escaped from the residence and contacted the Mexican authorities to inform them of the location where the other VICTIMS were being held captive. The Mexican authorities rescued VICTIM 3, along with the remaining VICTIMS.

39. As part of its investigation, on February 10, 2020, FBI Miami interviewed VICTIM 3. During the interview, VICTIM 3 identified CRESPO-MARQUEZ as the kidnapper VICTIM 3 knew as "El Nino" from a photo line-up containing the pictures of six individuals. VICTIM 3 said that he remembered that CRESPO-MARQUEZ repeatedly punched him in the face, shocked him with a stun gun, and appeared to be the leader of the group because he would give orders to the other members of the conspiracy.

## CONCLUSION

40. Based upon the aforementioned information, there is probable cause to believe that CRESPO-MARQUEZ did knowingly:

  a. Conspire to encourage and induce an alien to enter the United States, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(i), all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I);

  b. Encourage and induce and alien to enter the United States, in violation of Title 18, United States Code, Section 1324(a)(1)(A)(iv);

 c. Conspire to bring an alien into the United States for financial gain, in violation of Title 18, United States Code, Section 371;

 d. Bring an alien into the United State for financial gain, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii);

 e. Conspire to commit kidnapping Conspire to commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c); and

 a. Commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(a)(1).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

_____
Aaron D. Spielvogel
Special Agent
Federal Bureau of Investigation

Attested to by the Applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by FaceTime this 10th th day of August, 2020,
in Miami, Florida.

_____
HONORABLE CHRIS M. McALILEY
UNITED STATES MAGISTRATE JUDGE

12